May it please the Court, my name is Christopher Garrett. I represent the Petitioners Dekha Ali and her two sons. This petition for review raises two issues. I'd like to split my time more or less evenly among the two. The first issue is whether an immigration judge may permissibly conclude that an alien was firmly resettled in a third country for purposes of immigration laws, based solely on the length of time that she stayed there, despite undisputed evidence that during her stay in that country, she never had any form of official status or recognition by that country's government. The immigration judge said that the answer is yes, and we submit that the answer is no. The judge's decision conflicts with the plain language of the regulation. The regulation says that firm resettlement occurs when an alien enters a country with or while she is there, she receives an offer of permanent residence, citizenship, or some other type of permanent resettlement. But, Counsel, is it true that she hid from the government? There was no way the government could offer her firm resettlement. Isn't that true? You can read the record that way, but that, I believe that's consistent with her general approach to her situation in Ethiopia, which is that she never wanted to remain there permanently, and she was afraid that if she made contact with the government there, she'd be sent to a refugee camp. Would it make any difference if she had hid from the government for 25 years? That is a harder question. I think that at some point credibility issues come into play here, and I think it's very unlikely that this Court would be presented with a situation where an alien spent 25 years in another country and never had any contact with that government and suddenly found herself in the United States. But you don't need to answer that question, I think, to conclude that on this record, where she entered Ethiopia under the circumstances that she did and worked as a domestic servant for a family which, from the beginning, promised to help her leave that country, and ultimately did, that she approached her time there as a transient. What procedures are there in Ethiopia for official recognition of refugees as citizens or to otherwise given status for permanent residence? My understanding of the record, Your Honor, is that Ethiopia, at the relevant time, didn't make any provision for extending citizenship or permanent residence status to Somalis. There were a number of refugee camps set up on the borders of Ethiopia where approximately a quarter million Somali refugees, I believe at the height of the humanitarian crisis, were residing. Well, this presents sort of an interesting question that we've seen in other cases where a country doesn't have what we would consider analogous formal procedures to recognize citizenship. How do we treat people that either travel or are refugees in such countries? Because I think if you carry the logic far enough, that would mean that firm resettlement would never be possible in those countries. That may be, Your Honor. And if that's true, then that's a solution that needs to come about as a result of redrafting of the regulation. I think the regulation as written establishes a threshold finding which must be made before you can conclude firm resettlement. And that finding is that some kind of formal offer of permanent status was made by the government. And in countries where those provisions don't even exist, I don't think it's inconsistent with the purpose of the statute or regulation to say that aliens coming from those countries never had the kind of protection that you want them to have before you can say they were firmly resettled. That was the immigration judge's alternative holding. You might want to turn to the your second. I will. Thank you. For your argument in the time. The second issue concerns the circumstances of the 1991 attack on Mrs. Ali and her family. The immigration judge accepted her testimony in full about what happened that day. The family was attacked by a militia group which raped Mrs. Ali and murdered her brother-in-law. During the attack, they hurled several insults at the family, which explicitly taunted the family based, one, on its membership in a low-status clan, and, two, its perceived political allegiance to the governing regime. Notwithstanding that testimony, the immigration judge decided that the attack was a product of simple lawlessness and chaos and was not motivated even in part by either of those two protected characteristics. So the issue before you is whether an immigration judge can reasonably conclude that an attack has nothing to do with those two protected characteristics when the undisputed evidence shows that the attackers insulted the victims on those bases during the attack. In our briefing, we discussed several cases that I think show that the answer is no. I would also like to draw your attention to one other case not cited by either side, which I think is dispositive of this issue. The case is called Gafoor v. INS. That's G-A-F-O-O-R v. INS. The citation is 231 F. 3rd. 645. That's a decision of this Court from the year 2000. I don't have time to go into the facts, but ---- Would you submit that citation to the clerk? Yes. I will. She'll have a form for you afterwards.  Very good. Thank you, counsel. Thank you. Mr. Cunningham, I presume. Is that right? That's correct. You're substituting for your ---- Good morning, Your Honors. I'm John Cunningham from the Department of Justice, appearing on behalf of the Attorney General. And may it please the Court. I think it is most helpful to begin with firm resettlement because that's the framework that will govern how this Court approaches the rest of this case. If you find that the immigration judge was correct, correctly applied the law and acted on the basis of substantial evidence in finding that the Petitioner, Ms. Ali, had firmly resettled in Ethiopia before she came to the U.S., then asylum is out of the case. And I should note parenthetically here that the ---- there is no issue before you regarding protection under the Convention Against Torture that was raised to the immigration judge. But Petitioner has not addressed that question in either her principal brief or her reply brief. So that's now out of the ---- that's fallen by the wayside. What you're left with, then, is withholding of removal under the Immigration Nationality Act. That survives. You have a question about the settlement. I keep reading this statute, 208.15. An alien is considered to be firmly resettled if prior to the arrival in the United States, he receives an offer of permanent resident status, citizenship, or some other type of permanent resettlement unless he or she establishes and so forth. Yes. We apply that statute here. It appears that there is not firm resettlement. During your discussions with my colleague, the question of citizenship came up a lot. But the regulation is broader than that. It simply refers to an offer of some sort of firm permanent settlement in the intermediary country. Let's return to First Principles, which is the Chao case in this circuit, which the immigration judge correctly cited and which we cite in our briefs. That case held that when there is a lengthy period of quiet residence in the intermediary country, in that case Malaysia, a rebuttable presumption arises that firm resettlement was established, that an offer, in effect, had been received by the alien. And the burden of proof then shifts to the alien to show that no such offer was in fact received. All you knew in Chao was that the Petitioners had lived for three years in Malaysia, and there was no apparent disturbance of their lives while they were there. Here you have the following facts. You have the fact that Ms. Ali entered Ethiopia in March of 1991 and lived there until November 1996. That's five and a half years, nearly double the time in Chao. We know that she was never harassed by either the government of Ethiopia or her neighbors. There's no evidence of discrimination or harassment of her while she was there. She was able to work. She had a place to live. She was able to get married. She married for the third time while she was in Ethiopia. She was able to visit her two sons who were living elsewhere. And she was able to attend a rendezvous with her daughter by her first marriage, who was in Ethiopia briefly and then returned to Somalia. Her life during that five and a half years was quiet, without harassment, without interruption. The Chao presumption, therefore, arises that she had an offer of firm resettlement. Her argument is that that presumption was rebutted, that she overcame it because she never received an offer from Ethiopia. And the difficulty is, and this is what makes this case kind of interesting, is that we know that Ethiopia had extensive procedures in place to protect refugees from Somalia. They established refugee camps in conjunction with the UN High Commissioner for Refugees to treat hundreds of thousands of people who had come over the border after Somalia collapsed in 1991. And, to answer your question, Judge Thomas, there were asylum procedures in place in Ethiopia. There are statistics in the record, and I can give you the exact site, page 559, showing that Ethiopia did grant asylum to persons from Somalia. The petitioner first told the immigration judge that Ethiopia didn't grant asylum to refugees from Somalia. That was flatly not true. Later on, she receded to that by saying, well, the reason I didn't apply for asylum is that I was afraid they'd send me to a refugee camp. And she said that I didn't want to go to a refugee camp because those camps were dominated by a clan from Somalia who were hostile to my clan. She didn't say how she knew that, but that again is refuted by the record. This is an excerpt from a report from the UN High Commissioner for Refugees, page 558 of the record. They describe the establishment of the camps by Ethiopia, which is really a remarkable thing given Ethiopia's own difficulties during this time, and that hundreds of thousands of persons were housed in these camps, that some repatriation to Somalia was going on. And then the UN High Commissioner says, the refugees' food supply is guaranteed by the World Food Program. UNHCR takes care of the rest, health, education, drinking water, infrastructure development projects, community services, and income-generating projects. Counsel, there were camps. Yes, ma'am. How does that amount to permanent resettlement? Oh, I'm sorry. I didn't mean to say that it did. But my point is that her explanation for why she never sought asylum in Ethiopia was that life in the camp would be dangerous for her, that if she approached the government and said, I want asylum in Ethiopia. That's why she didn't go to the camps. That isn't why she didn't seek asylum. No, ma'am. She said that the reason I didn't seek asylum, the reason I didn't approach the government is that they put me in a camp. Yes. And then she said, then she explained that if I went to the camp, I'd be in danger because those camps are dominated by persons hostile to my clan. I'm simply saying that there's no evidence to back that up, and the only evidence you do have on the record about life in those camps is to the contrary. They seem to be entirely decent places run by the U.N. where persons were housed and fed and educated and trained. Well, excuse me, Counsel. Yes, sir. I'm sorry to interrupt you. Our Federal prisons are run by the Federal Government, but they have plenty of violence in them. I, you know, just saying the U.N. runs the camp doesn't answer the question. Doesn't this turn a little bit on intent on her part? Yes. Doesn't it? So here we have a woman who runs away from Somalia, understandably, and the, I think importantly, the immigration judge accepted her story here as credible because she is raped. Her brother-in-law is killed before her very eyes. Her children are beaten because she comes from a so-called untouchable or low caste in their society. Clearly a reason that we would consider an appropriate reason for immigration to this country. And she then goes to Ethiopia where she perceives that members of the higher castes are going to be dominant, and if she shows up there, she is going to be again subjected to the same kind of treatment she has been subjected to in her own country. I'm finding a hard edge here. I'm trying to decide how the immigration judge can accept her story about her reason for leaving as being absolutely credible and without rebuke, and yet come over here and say, well, she was just, you know, hiding away. She was obviously lying. Oh, no, no. I don't think the immigration judge found that she was lying. How can he then find that her story that she didn't want to go to this refugee camp, and I think we can all surmise that if the refugee camp is loaded with Somalis and that her group is a minority and regarded as a low caste, untouchable group to be abused, that she is going to be thrown in there with them in that mix. Why is she not correct in her, or at least understandably correct in her belief that if she goes in there, she's going to be abused? I mean, I'm having a hard time. Well, I think you need to look at the full record. And, of course, bearing in mind that I refer the Court to page 433 of the record, that's a declaration that she gave to the immigration judge in which she describes meeting her third husband in Somalia, excuse me, in Ethiopia in 1993, and then she says, we often discussed our plans to go to the United States. That's why I suggest that there is evidence there, at least, that the reason she didn't want to go to the camps is because she had no interest in staying in Ethiopia. My colleague has, in fact, said that, that her intention was never to stay there. But that's not what the firm resettlement doctrine states. It states that if the total circumstances of your stay in the intermediary country is such that you had a quiet time, that there was no evidence of harassment, then a presumption arises that you could stay there. And the burden then shifts to you to show that you could not have stayed there, that you did not receive a firm offer. And I don't think you can defeat that by intentionally not taking advantage of the clear procedures that were in place in Ethiopia for housing people and then. But what about you have to address this problem, though. What the clear procedure is to then put her in a refugee camp, which then puts her right back with the same group, in her perception, that abused her. With respect, I must clarify, Your Honor, there is not, there's nothing in this record to assume that if she approached the government, she would be sent to a camp. That's not in the record. She said that, but that's not in the record. That was her perception. Yes, ma'am. Yes, it was. That was her perception. The regulation, I don't think, allows for that. My time is up. We haven't addressed the other half of the case at all. I have one final question on this, if I might. Yes. I mean, the idea of the firm resettlement regulation, and especially we've extrapolated that in Vong, and I think Chow followed that, was the idea that we could presume from the circumstances that a country was making more or less an offer of permanent residency. Malaysia is different from Ethiopia during that period, obviously. And it's, is there any, what can you point to in the record, and I, without getting into burden allocation, what, what can you point to in the record that would indicate that Ethiopia, during this period of time, would have extended her an indefinite stay? The statistics in the record, Your Honor, that I've already given you the page site, indicating that Ethiopia did have asylum procedures in place and did grant applications. There weren't many applications, but they granted them. And the State Department also said, in his own report, which is cited in our brief, that there was absolutely no evidence that Ethiopia evicted people, forcibly removed people, who had a valid claim for asylum. You said Malaysia is different from Ethiopia. This record is much stronger on firm resettlement than Chow ever was. Another case that you might take guidance from is Judge Reinhart's opinion in Andreasium, which we cite in our brief. There, the person, the petitioner was from Azerbaijan. He went to Armenia. The immigration judge found firm resettlement in Armenia. Judge Reinhart overturned it. The court overturned it, finding the following things, none of which are present here. He found that the family in question never lived in Armenia for more than eight months at a time. They moved constantly. They lived in Armenia no more than 22 months out of the 44 months in question. Here you have five and a half years. He found that while the family was in Armenia, they were constantly harassed for being Azerbaijan. No harassment here. He found that there were no clear procedures in Armenia for seeking asylum. You have procedures here. He found that, and this is key, the petitioner, the lead petitioner in Andreasium actually approached the government in Armenia to inquire about the possibility of temporary resident status and was told, no, go away, go back to Azerbaijan. You don't have that here. None of those factors that undercut the Chao presumption are present in this case, and, in fact, the record is all to the better. One last point. I know my time is up, and we haven't discussed the rate question at all. I do want to clarify our position on the – I'm sorry, Judge Reinhart. I was going to say we'll give you two minutes to talk about the asylum. Okay. Well, it's really just – it's really just a receding from our position in our brief. This has to do with the remand issue. I said at the beginning of my presentation that if you uphold the firm resettlement finding, all you're left with is withholding. Now, if you – if a finding of – you still have to examine the facts of January 1991 to see if that amounted to persecution within the meaning of the asylum laws. If you make that finding, and we obviously hope you don't, but if you do, then a presumption arises under the withholding regulations that the petitioner had met her burden of proof that she is more likely than not to be persecuted again if she's sent back to Somalia. In our brief, we argued that the immigration judge applied a changed country conditions analysis and found that that burden had been – that presumption had been overcome by the improvement in conditions in Somalia during the period of record. Upon review of our brief and the record, we've – I concluded that the immigration judge's decision can't quite be read that way. That's not a fair reading. I think his references to improvements in country conditions in Somalia was in connection with a freestanding analysis of the withholding question separate and apart from what happened in January 1991. So if – I'm sorry to interrupt. Yes, ma'am. Judge Ezra spoke of the horrendous conditions. I mean, the rape, the killing of her brother-in-law and so forth. Would that arise to question of a humanitarian grant of asylum? It would not then matter about future persecution. It would – it could be, Your Honor, but that was not raised below. The immigration judge – you're talking about the – yes, a finding of asylum eligibility, no matter what is going on. Yes. The thing was so horrendous that we're going to admit her anyway. The matter of Chen doctrine cases, yes. That wasn't raised below. But I do just want – so it's not really before you. It just – it's not in the case. It could be under certain circumstances, but we just don't know. The one thing I did want to clarify, though, that we do agree now that if the Court finds that the Petitioner established past persecution in January of 1991, you need to remand back to the Board because the immigration judge's decision does not make that – does not proceed on that – on that presumption that's established. I appreciate that. Thank you, Your Honors. I appreciate your indulgence. Good morning. I appreciate the government's last point, which – with which I agree, and I would just like to take a minute to talk about the Chau case, which is what the government rests its entire firm resettlement argument on. This case is different from Chau in one critical respect. In Chau, the presumption arose because there was no direct evidence in the record either way about whether a formal offer of resettlement had been made. The record was silent. The record is not silent here. Mrs. Ali testified without contradiction that she never attained any form of official status in that country. She was a stranger to the Ethiopian government. On that record, you cannot conclude that the government made her a formal offer of anything. If you look at the Chau and the Andre Asian cases, as my final point, you'll see that they use very similar language when talking about what firm resettlement means. They ask whether the alien had a right to remain in that country or a right to return there. And the word right is very significant for reasons that I think Judge Becker explained very well in the Third Circuit's ideal case. Right implies something that you can invoke for some kind of protection. And if you are living in Ethiopia as an undocumented domestic servant, you don't have any rights to invoke. As he pointed out in the ideal case, Judge Becker, you can survive physically in a country for a long time living under the radar screen. But that doesn't mean that you have acquired citizenship or residency by adverse possession. Thank you. Thank you, counsel. The case is ready to be submitted.
judges: D Nelson, Thomas, Ezra